COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                                 NO.
2-08-360-CR

 

 

FREDERICK
DEWAYNE                                                                     APPELLANT

MALONE A/K/A
FREDERCK 

DEWANGE MALONE

 

                                                             V.

 

THE
STATE OF TEXAS                                                                             STATE

 

                                                       ------------

 

              FROM THE 396TH
DISTRICT COURT OF TARRANT COUNTY

 

                                                       ------------

 

                                      MEMORANDUM OPINION[1]

 

                                                       ------------








A jury convicted Appellant Frederick
Dewayne Malone a/k/a Frederck Dewange Malone of capital murder, and, the State
having waived the death penalty option, he received an automatic life
sentence.  In five points, Appellant
contends that the evidence is legally and factually insufficient to support his
conviction and complains about the admission of his oral confession and the
State=s closing argument at the
guilt-innocence phase.  Because we hold
that the evidence is legally and factually sufficient to support Appellant=s conviction and that the trial court
did not err, we affirm the trial court=s judgment.

Facts

Mrs. Eloida Marin testified that on
December 21, 2006, she and her husband, Antonio, arrived in Fort Worth to visit
with their son, Ruben, and his family. 
On December 30, after 8:00 p.m., Mrs. Marin, Antonio, Ruben, and Ruben=s two children were sitting in the
living room when Mrs. Marin heard a knock on the door.  Ruben got up to answer the door.  He did not see anyone through the peephole.  He opened the door about six inches, and then
two young African-Americans slammed it open and forced him to the floor.  Mrs. Marin described the men as each having Aa little bit of beard@ and stated that one was tall and the
other one was short.  She clarified her
earlier testimony about the two men slamming the door open, explaining that the
short one had come in first and had taken Ruben to the ground.  The tall one had pointed a gun at her husband
and her.  By this time, she and her
husband had stood up.  Mrs. Marin
testified that the first shot occurred when the short man shot Ruben; the tall
man was pointing his gun at her husband and her.  Her husband moved to help Ruben, and then the
tall man shot her husband.  But neither
Mrs. Marin nor her husband realized that he had been shot until the paramedics
had removed Ruben from the apartment. 
The paramedics took both men to the hospital, where Antonio later died.








Mrs. Marin testified that she did not
identify the two intruders from a photo spread. 
In court, she tentatively identified Appellant as the person who had
shot her husband, stating that she was not sure.

On cross-examination, Mrs. Marin
indicated that she had initially told the police that the short person had shot
both her husband and her son.  She also
admitted when asked, AAnd do you remember indicating or
telling Ms. Reyes that you thought maybe the tall one shot your husband, but
then you later told Ms. Reyes that you didn=t see who shot your husband because you were nervous and your
eyes were on your son?@, that A[she] always ha[d] said that, [but had] recalled very well
that the taller one shot [her] husband.@








Ruben Marin testified that on
December 30, he arrived home about 8:00 or 8:30 p.m.  He had more than $1,000 in his wallet.  He was sitting on the love seat close to the
front door, talking with his parents and children, when he heard a knock on the
door.  He looked through the peephole and
saw an unfamiliar African-American man. 
Ruben then opened the front door about three or four inches to see what
the stranger wanted.  The stranger tried
to get into the apartment.  Ruben tried
to close the door, but the stranger put his foot down and wedged his hand in to
prevent the door from closing.  Ruben
recalled that the stranger had a medium-sized black revolver in his hand.  Ruben tried to take the gun away from the
stranger.  Ruben testified that they
struggled for the gun but that he let go when he realized that his children
were nearby.  Ruben testified that during
the struggle, he noticed that another unfamiliar African-American man had come
in and had moved toward his parents. 
Ruben testified that the second man had a silver gun, like a square, and
that the second man pointed the gun at the elderly Marins.  Ruben testified that when the second man came
in, the first man shot Ruben in the side. 
The first man then ripped Ruben=s left pocket, removing a magazine, and took Ruben=s wallet from his right pocket.  Ruben=s dad moved closer to Ruben to help him, and then Ruben heard
but did not see another shot.  The second
intruder was beside Ruben=s dad, and the first intruder was
still behind Ruben, near the front door, when Ruben heard the shot.  Ruben testified that the second man was
taller than the first, with a fuller face, and that the second man had a shaved
head.

Detective Billy W. Randolph testified
that a few days after the Marin robbery, he began to suspect Desmond Brooks, a
resident of Ruben Marin=s apartment complex who had committed
a robbery earlier in December.  Detective
Randolph testified that Desmond Brooks was about five feet, six inches tall or
five feet, seven inches tall and weighed about 160 pounds.  Detective Jose Hernandez testified that
Brooks was five feet, seven inches tall and weighed 140 pounds.  The police arrested Brooks on outstanding
warrants and interviewed him for several hours. 
Detective Randolph testified that during the Brooks interview, Appellant=s name came up (the detective
testified that Brooks said that Appellant was his next-door neighbor), and
Brooks also told the police where to find evidence of the Marin robbery.








Officer Bill Yeager testified that he
participated in the search of Apartment 229 at Ruben=s apartment complex and collected two
weapons, ammunition, and personal effects. 
Relying on information gleaned from the Brooks interview, the police
found one of the weapons, a firearm, in a sock in a laundry basket in the
bedroom closet.  Officer Yeager also
found a wallet in the air conditioning unit. 
At trial, Detective John Livesay identified the firearm found in the
sock, State=s Exhibit 37, as a .22 caliber
revolver, and he identified the wallet as Ruben=s.

Detective Livesay searched the car of
Brooks=s girlfriend.  He found receipts showing that Appellant
rented Apartment 228, the apartment next to Brooks=s, which Detective Livesay confirmed
with the apartment=s management.  Officer Yeager also searched Apartment 228.








Appellant was subsequently arrested
for the Marin robbery in Austin County. 
Detectives Hernandez, Livesay, and Randolph went to that county to
interview Appellant, who Randolph testified was about six feet, two inches tall
and weighed about 175 pounds.  All three
detectives identified Appellant at trial. 
During the interview, which was recorded, Appellant admitted to knowing
that his cousin, Brooks, was going to rob someone, agreeing to be Brooks=s driver, entering the apartment with
a gun at his side, and ushering the two wounded men and the elderly woman into
the bathroom after the robbery and shootings. 
He denied shooting anyone and claimed that he had purchased the .22
recovered upon his arrest from Brooks after the robbery.  He also stated that he was a psychopath, saw
a psychiatrist, and was on Trazadone and Restidol.  The interview took place in the wee hours of
the morning, and Appellant yawned occasionally during the twoBthree hour interview.

After the interview, Detective
Randolph took custody of Appellant=s possessions and personal effects with which he had been
arrested, including a pistol that was sealed in a bag.  Detective Randolph did not open the bag.  Detective Livesay testified that the pistol
recovered from Appellant was a .22 caliber.

In comparing the .22 caliber pistol
found at Brooks=s apartment and the .22 caliber
pistol recovered when Appellant was arrested, Detective Livesay testified that
Appellant=s gun had a longer barrel (four
inches) and a nine-shot capacity.  The
revolver found in Brooks=s apartment had about a
two-and-a-half-inch barrel.  Michael
Ward, senior forensic scientist in the firearms and tool mark unit of the Fort
Worth Police Department=s crime laboratory, testified that
the bullet recovered from the elder Mr. Marin=s body, State=s Exhibit 31C, had been fired from
State=s Exhibit 52, the .22 seized upon
Appellant=s arrest.  Ward also testified that the same bullet was
not fired from State=s Exhibit 50, the .22 retrieved from
Brooks=s apartment.

A jailhouse informant also testified
that Appellant admitted to participating in the crime, but the informant=s report of some of the details of
the offense, such as the location of the bullet wounds on the Marin men,
differed from the forensic evidence admitted at trial.








Legal
and Factual Sufficiency

In his first point, Appellant
challenges the legal sufficiency of the evidence supporting his
conviction.  The indictment alleges that
Appellant intentionally caused the death of Antonio Marin by shooting him with
a firearm in the course of committing or attempting to commit the offense of
robbery of Antonio Marin or Ruben Marin. 
The jury charge includes a charge on the law of parties.

Section 19.03(a) of the penal code
provides in relevant part that A[a] person commits [capital murder]
if the person commits murder as defined under Section 19.02(b)(1) and . . . the
person intentionally commits the murder in the course of committing or
attempting to commit . . . robbery.@[2] 
Section 19.02(b)(1) of the penal code provides that a person commits
murder if he Aintentionally or knowingly causes the
death of an individual.@[3] 
Section 29.02 of the penal code provides in relevant part that a person
commits robbery Aif, in the course of committing theft
. . . and with intent to obtain or maintain control of the property, he . . .
intentionally, knowingly, or recklessly causes bodily injury to another.@[4]








Appellant contends that Brooks
committed the offense and that he was just Brooks=s pawn and has always maintained his innocence.  But Appellant=s own statement is evidence that at a minimum, he agreed to
be the getaway driver and then escalated his participation by entering the
apartment carrying a loaded gun and by ushering the adult Marins into the
bathroom after the robbery and shootings. 
Applying the appropriate standard of review,[5]
we hold that the evidence is legally sufficient to support Appellant=s conviction for capital murder.  We overrule Appellant=s first point.

In his second point, Appellant
contends that the evidence is factually insufficient to support his conviction
for capital murder.  Again, though, his
own statement provides evidence of his culpability in the offense, as does the
ballistics match of the bullet taken from the elder Marin=s body and the .22 seized upon
Appellant=s arrest.  Applying the appropriate standard of review,[6]
we hold that the evidence is factually sufficient to support Appellant=s conviction for capital murder.  We overrule his second point.

Appellant=s Confession








In his third point, Appellant
contends that the trial court erred by denying his motion to suppress his oral
statement taken in violation of article 38.22 of the code of criminal
procedure, claiming that he did not understand the warnings under article
38.22, that he would not have given a statement had he understood that he could
terminate the interview, that he was on medication that prohibited him from
understanding the interview process, and that his will was overborne.  He also contends that A[t]he officer used a method to induce
. . . [him] to give a statement that was in violation of the due process clause
of the State and Federal Constitutions@ and that the statement was involuntary, violating Article
38.21.

Article 38.21 of the code of criminal
procedure provides that A[a] statement of an accused may be
used in evidence against him if it appears that the same was freely and
voluntarily made without compulsion or persuasion, under the rules hereafter
prescribed.@[7] 
Article 38.22, section three of the code of criminal procedure provides,

(a) No oral . . .
statement of an accused made as a result of custodial interrogation shall be
admissible against the accused in a criminal proceeding unless:

 

(1)
an electronic recording, which may include motion picture, video tape, or other
visual recording, is made of the statement;

 

(2)
prior to the statement but during the recording the accused is given the
warning in Subsection (a) of Section 2 above and the accused knowingly,
intelligently, and voluntarily waives any rights set out in the warning;

 

(3)
the recording device was capable of making an accurate recording, the operator
was competent, and the recording is accurate and has not been altered;

 

(4)
all voices on the recording are identified; and








 

(5)
not later than the 20th day before the date of the proceeding, the attorney
representing the defendant is provided with a true, complete, and accurate copy
of all recordings of the defendant made under this article.

 

(b) Every
electronic recording of any statement made by an accused during a custodial
interrogation must be preserved until such time as the defendant=s
conviction for any offense relating thereto is final, all direct appeals
therefrom are exhausted, or the prosecution of such offenses is barred by law.

 

.
. . . 

 

(e) The courts of
this state shall strictly construe Subsection (a) of this section and may not
interpret Subsection (a) as making admissible a statement unless all requirements
of the subsection have been satisfied by the state, except that:

 

(1)
only voices that are material are identified; and

 

(2) the accused was given the warning
in Subsection (a) of Section 2 above or its fully effective equivalent.[8]

Appellant does not provide any specific arguments or analysis
to support his contentions, nor does he point to any specific violations of
these statutes.

The trial court found that

$       
Appellant was Aadvised
of the statutory warnings as required by Article 38.22 . . . [and that he]
freely, voluntarily, intelligently, and knowingly waived those rights and
agreed to answer questions@;

 

$       
Appellant never
requested to have a lawyer present or to terminate the interview;

 

$       
Athe Court was not convinced that [Appellant=s
yawning] had anything to do with any type of inability to comprehend what was
going on@; and








 

$       
Appellant Awas
lucid throughout the interview and was able to address and to answer questions
or respond in an appropriate manner to the questions.@ 

 

The trial court concluded as a matter of law that all the
requirements of article 38.22 had been met.








Our review of Appellant=s statements shows that it was taken
in compliance with articles 38.21 and 38.22 as well as the state and federal
constitutions.  Appellant was Mirandized,
and his statement was recorded.  All
speakers were identified.  Appellant told
the questioning officers that he was on Trazadone and Restidol, that he was a
psychopath, that he saw a psychiatrist, and that the medicine helped him
relax.  He also yawned occasionally
during the interview, which was taken in the early morning hours.  But nothing in our review of his statement,
or the other evidence in the record, for that matter, raises an issue of any
incompetence of Appellant or any failure by him to understand the interview
proceedings.[9]  Further, while we note that the officers used
permissible trickery, deceit, and other persuasive techniques in their
questioning of defendant, our review of the recorded interview does not show
that any of their actions appear calculated to produce an untruthful confession
or one that is offensive to due process,[10]
and Appellant does not otherwise point to any such actions.  We cannot conclude that his will was overborne.[11]  Based on the applicable standard of review,[12]
we hold that the trial court properly denied Appellant=s motion to suppress.  We overrule Appellant=s third point.








In his fourth point, Appellant
contends that the trial court abused its discretion by overruling his rule 403
objection to the admission of his oral statement.  Rule 403 provides that A[a]lthough relevant, evidence may be
excluded if its probative value is substantially outweighed by the danger of
unfair prejudice, confusion of the issues, or misleading the jury, or by
considerations of undue delay, or needless presentation of cumulative evidence.@[13] 
A trial court is not required to perform a balancing test in a formal
hearing on the record.[14]  Given the inability of the Marins to
positively identify Appellant as one of the robbers and the risk that the
jailhouse informant=s mangling of some of the details of
the offense as compared to the forensic testimony could have made him appear
less than credible to the jury, as could the fact that he was allowed to plead
to a lesser offense in an unrelated case in exchange for his testimony against
Appellant, Appellant=s statement was highly probative and
was crucial to the State=s case.  Further, as we held above, Appellant does not
point to any improper actions by the officers in taking his statement.  Accordingly, the trial court could have
properly decided that the probative value of Appellant=s statement was not substantially
outweighed by the danger of unfair prejudice. 
We overrule Appellant=s fourth point.

In his fifth point, Appellant
contends that the trial court erred by denying his motion for mistrial when the
prosecutor commented that a composite sketch looked like Appellant to him.  At trial, Appellant objected that the
argument was Aoutside the record@ and Aimproper.@ 
Appellant argues on appeal that the argument was improper because it
stated the prosecutor=s personal opinion and because the
prosecutor was not subject to direct or cross-examination.  The trial court sustained his objection,
instructed the jury to disregard the improper argument, and denied Appellant=s motion for mistrial.








When a trial court sustains an
objection and instructs the jury to disregard but denies a defendant=s motion for a mistrial, the issue is
whether the trial court abused its discretion in denying the mistrial.[15]  Only in extreme circumstances, when the
prejudice caused by the improper argument is incurable, that is, Aso prejudicial that expenditure of
further time and expense would be wasteful and futile,@ will a mistrial be required.[16]  In determining whether a trial court abused
its discretion in denying a mistrial, we balance three factors:  (1) the severity of the misconduct
(prejudicial effect), (2) curative measures, and (3) the certainty of
conviction absent the misconduct.[17]  Given the trial court=s prompt instruction to disregard the
prosecutor=s comment, Appellant=s confession, and the ballistics
match between his .22 and the bullet taken from Antonio Marin=s body, we cannot conclude that the
trial court abused its discretion by denying a mistrial.  We overrule Appellant=s fifth point.

Conclusion

Having overruled Appellant=s five points, we affirm the trial
court=s judgment.

 

 

LEE
ANN DAUPHINOT

JUSTICE

 

PANEL:  DAUPHINOT, GARDNER, and WALKER, JJ.

 

DO NOT PUBLISH

Tex. R. App. P.
47.2(b)

 

DELIVERED:  March 11, 2010











[1]See Tex. R.
App. P. 47.4.





[2]Tex. Penal Code Ann. ' 19.03(a) (Vernon Supp. 2009).





[3]Id. ' 19.02(b)(1)
(Vernon 2003).





[4]Id. ' 29.02(a)(1).





[5]See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton
v. State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (both providing
standard for reviewing the legal sufficiency of the evidence).





[6]See Steadman v. State, 280 S.W.3d 242, 246B47 (Tex. Crim. App. 2009); Lancon v. State, 253
S.W.3d 699, 704 (Tex. Crim. App. 2008); Watson v. State, 204 S.W.3d 404,
414B15, 417 (Tex. Crim. App. 2006); Johnson v. State,
23 S.W.3d 1, 8B9, 12 (Tex. Crim. App. 2000) (all providing standard
for reviewing the factual sufficiency of the evidence).





[7]Tex. Code Crim. Proc. Ann. art. 38.21 (Vernon 2005).





[8]Id. art. 38.22.





[9]See Lucas v. State, 791 S.W.2d 35, 62 (Tex. Crim. App. 1989).





[10]See Creager v. State, 952 S.W.2d 852, 856 (Tex. Crim. App. 1997).





[11]See id.





[12]See Amador
v. State, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); Estrada v. State,
154 S.W.3d 604, 607 (Tex. Crim. App. 2005); Johnson v. State, 68 S.W.3d
644, 652B53 (Tex. Crim. App. 2002); Guzman v. State, 955
S.W.2d 85, 89 (Tex. Crim. App. 1997).





[13]See Tex. R.
Evid. 403.





[14]Williams v. State, 958 S.W.2d 186, 195B96 (Tex. Crim. App. 1997).





[15]Hawkins v. State, 135 S.W.3d 72, 76B77 (Tex. Crim. App. 2004).





[16]Id.; see also Simpson v. State, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003), cert.
denied, 542 U.S. 905 (2004).





[17]Hawkins, 135
S.W.3d at 77; Mosley v. State, 983 S.W.2d 249, 259 (Tex. Crim. App.
1998) (op. on reh=g), cert. denied, 526 U.S. 1070 (1999).